Willie R. JANICEK, Appellant,

v.

The STATE of Texas, Appellee.

No. 61622.

Court of Criminal Appeals of Texas,
Panel No. 1.

June 9, 1982.

Rehearing Denied July 7, 1982.

John Francis, Temple, for appellant.

Arthur C. Eads, Dist. Atty. and Steven C. Copenhaver, Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, CLINTON and McCORMICK, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a judgment of conviction for the offense of murder, assessing punishment at confinement for life, both on the basis of jury verdicts. Proof essential to support the verdict of guilty in this circumstantial evidence case was obtained and developed after a forced entry into the locked residence of appellant, and

in ten of his eleven grounds of error appellant complains of the action of the trial court in overruling his motion to suppress that evidence and its fruits. A full statement of events leading up to the challenged entry is necessary to understand the unusual problem presented by the grounds of error, and to the task of summarizing the testimony presented by the State on hearing of the motion to suppress we now turn.[1]

Appellant, married to her twenty nine years, was convicted of killing his estranged wife, Alibina Janicek.[2] She had taken up residence in an apartment in Temple, Bell County, some two weeks before she was shot to death in the parking area of her apartment during an early daylight hour.

Ronnie Gene Dorner, then twenty seven years old, had been married to Carolyn Janicek Dorner, a daughter of appellant and his deceased wife, for six years. Shortly, a nurse at Scott & White Hospital called to tell them that Mrs. Janicek had been shot and was in critical condition, but by the time they reached the hospital she had passed away. Appellant was not at the hospital, though some other relatives arrived or were called and told what had happened.[3] Within fifteen minutes, or around eight o'clock, since they did not have a telephone, Ronnie Dorner left to drive to Buckholts for the purpose of informing the Tomaceks, brother and sister-in-law of Mrs. Janicek.

In Buckholts, on the way to their place, Dorner passed the home of appellant, and saw his car in the driveway; however, he did not stop, but proceeded on to the house of Frank Janicek, appellant's brother. His expressed reason for not stopping and continuing on to the brother's house was "to see if he would go over there with me because, well, I just didn't want to go over there by myself, you know, to tell him or anything"—he later explained, "I was scared of him."

So, Dorner and Frank Janicek went to appellant's home. The blue and white Plymouth Duster was still in the driveway. They walked around to the back porch and noticed that the screen door was not secured with a small padlock; from that Dorner deduced that appellant might be at home since "usually when he leaves he always puts it on there." Their calling was not answered; their knocking produced no response. Frank Janicek wanted to go in, but Dorner "kind of talked him out of it" because he "didn't want to bust the door in."[4] The pair went next door to the residence of John Zajcek, the constable in Buckholts, and talked to him. Zajcek crossed the street and from neighbors learned that they had seen appellant drive up and had not seen him leave; meanwhile Mrs. Zajcek remarked that she had "heard a shot that morning," as did the women across the street, but paid no attention to it because "they thought maybe somebody was shooting at a dog or something" in the semirural community. Questioned about her remark, Mrs. Zajcek said "she didn't know where it came from" and did not indicate at what time she "thought she heard it." Dorner asked the constable to call the Cameron Police Department "and get them out there." Sheriff Broadus and other peace officers soon arrived at Constable Zajcek's house.

1. Much of the testimony received by the court is hearsay, adduced to show what led up to the entry, arrest and seizure complained of, and is to be considered in that light.

2. The first name is spelled as in the indictment; however, the transcription of notes of the court reporter spells it "Alvina."

3. While at the hospital they were told, presumably by police officers who were already doing so, that the death of Mrs. Janicek was under investigation. Shortly after arriving at his office between 7:30 and 8:00 a. m. Milam County Sheriff Leroy Broadus received a teletype from the Temple Police Department about a homicide in Temple stating, on a basis not otherwise disclosed by testimony, "the name and address of Mr. Janicek [appellant] in Buckholts," that there was "supposedly a white over blue Plymouth involved and that Mr. Janicek ... was supposed to be armed."

4. Dorner "had thought maybe the police department had already picked him up," and may have advanced that idea to dissuade Frank Janicek. Actually, Dorner admitted, "I would have been scared to go in by myself but I believe I would have."

Dorner and others reported what they had been told, including that a shot had been heard, and that "we were concerned about him and everything." As they started toward appellant's house, the Sheriff said "he didn't have a warrant and he couldn't enter the house," so Dorner asked him "if he would just go with me in case I needed some help." The Sheriff said he "couldn't go because he didn't have a warrant, but he could go with me"—"so we went." Over objection that the question invited speculation, the court permitted the following:

"Q: Based on all of the facts you knew at that time had you formed some opinion as to what the situation might be inside the house?

A: Yes, sir. I kind of had the opinion that he might have shot his self." [5]

Dorner and Frank Janicek, the Sheriff and five of his deputies, all went onto appellant's property, walked to his back entrance; opening the screen door, Dorner and perhaps Frank Janicek, again knocked on the back door and hollered. The door was locked from inside, so when they got no response Dorner simply kicked in the door. The entire company began to enter the kitchen with Dorner in the lead. He saw appellant seated and slumped over a table in a state of unconsciousness—though not from a gunshot wound.

From the standpoint of the Sheriff the ultimate entry takes on a somewhat different hue. The teletype from Temple Police Department had also cautioned that "the subject" might be armed with a rifle, and at some point Temple followed up with a radio report that a .22 caliber rifle was believed to have been used in the homicide. After receiving that teletype, Sheriff Broadus had dispatched a deputy to go by appellant's home; he returned and reported a Plymouth automobile fitting the teletyped description was in the driveway. Sheriff Broadus queried Temple police whether a

warrant had been issued; learning that one had not, the Sheriff took no further action because "we were waiting on a warrant from the Temple Police Department."

Then Constable Zajcek made the first of his two calls. He advised that Dorner and Frank Janicek were at his house and said they "couldn't get [appellant] to come to the door." About five minutes later Zajcek "assumed at this point that maybe" appellant had shot himself or he needed some type of attention, and he suggested that "we might should bring the Justice of the Peace with us when we came." Sheriff Broadus brought a Justice of the Peace and called an ambulance service to go to Buckholts and standby up the street from appellant's home "until we saw what condition we had there."

All peace officers rendezvoused at the house of Constable Zajcek with him, Dorner and Frank Janicek, and the latter filled the Sheriff in "on the facts as they understood them at that time." Frank Janicek was "very concerned, wanted to go in and see if he had been shot," but the Sheriff said, in his words:

"I didn't have a warrant at this time. If they wanted to go in I would go in with them and assist them."

So they all went to the back door and, as Sheriff Broadus stood beside him, Dorner "kicked the back door in and we went in and found [appellant] in the kitchen."

On cross-examination Sheriff Broadus elaborated on his discussion with Dorner, *viz*:

"The discussion about the warrant, we had a discussion about what I needed to be legally going into the house if I went in. I didn't go in to arrest the man. We went in to check on his welfare. This discussion between me and Mr. Dorner took place before we ever entered the house.

Q: Okay, and at that time did you indicate that you would prefer not to go

---

**5.** The explanation of what led him to that belief started with his understanding that the Janiceks just did not get along too well and appellant had threatened her several times, so Dor- ner figured that appellant might have shot his wife, but "didn't know for sure," and figured that "he might have taken his own life too."

in the house even under these circumstances until the warrant arrived.

> A: I told him that I had rather not. It would put us in a bad situation."

Having waited two hours for a warrant without going into the house, the Sheriff again agreed that "we went in" only after Dorner had "volunteered to go in with you and requested you go in with him." [6]

In denying appellant's motion to suppress the trial court made findings of fact from generally undisputed testimony and conclusions of law.[7] With respect to the forced entry, the gravamen of several fact findings is that, though Sheriff Broadus knew appellant was a suspect in the homicide, he was "motivated primarily" by the intent to determine the welfare of appellant and to provide him with medical attention, and that the Sheriff "had a reasonable basis, approximating probable cause, to believe that an emergency medical situation existed witin [appellant's] residence at the time of his entry into it." Accordingly, the court concluded that, since entry was "in response to an 'emergency' which both [Sheriff Broadus and Dorner] reasonably believed to exist," the situation "constituted exigent circumstances which created an exception to the general rule that a search warrant must be obtained before entry into a protected place." [8]

Focusing on findings regarding forced entry, the parties do not really dispute the facts, but they do draw from them different inferences to invoke what each conceives to be the applicable law. In this connection, both sides begin with *Brown v. State*, 475 S.W.2d 938 (Tex.Cr.App.1971) and follow on with its progeny.[9] However, *Brown* and the others cited in the margin are more properly regarded as a "murder scene exception" fashioned by the Court from the common law "exigency rule," and we now know from *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) that there is not any such exception in Fourth Amendment law. See *Pearson v. State*, 587 S.W.2d 393 (Tex.Cr.App.1979). What we must determine is the meaning of the so-called "emergency doctrine," its vitality in Texas criminal jurisprudence and whether the circumstances shown in this record triggered its operation.

At the outset we emphasize that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972); *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). See also *Boyd v. United States*, 116 U.S. 616, 630,[10] 6 S.Ct. 524, 29 L.Ed.2d 746 (1886). Similarly, Section 9 of our own Bill of

---

**6.** Sheriff Broadus hypothesized that "not necessarily" would he have waited on the warrant had Dorner not made the request, for "we were in a situation where ... after we received the information, *the gunshot being fired in the house*, we probably would have had to have gone in anyway." Of course, there was no such report as that.

**7.** While the court made no specific finding concerning the matter, the record shows that on the representation among others, that appellant's attorney had been informed by members of his family, friends and acquaintances that appellant "has had symptoms of severe mental disorder or mental defects," the trial judge ordered appellant be transported to Rusk State Hospital for a psychiatric examination. The resultant report, filed two months before the suppression hearing, confirmed "apparent psychiatric history" of the sixty-two year old appellant, but diagnosed his current condition as "Marital Maladjustment."

**8.** The court went on to find that seizure by Dorner of a .22 caliber rifle with several live bullets and one spent hull in its chamber after it was seen in open view on a bed some twenty feet down a hallway from the kitchen was lawful and not violative of any rights of appellant, and that its "seizure" by Sheriff Broadus from Dorner was proper under the "silver platter" doctrine.

**9.** *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr. App.1973), *Hunter v. State*, 496 S.W.2d 44 (Tex.Cr.App.1973) and *Tocher v. State*, 501 S.W.2d 921 (Tex.Cr.App.1973).

**10.** The principles reflected in the Fourth Amendment "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life."

Rights has been held to protect against intruding into so lowly an abode as a tent. *Chapin v. State*, 107 Tex.Cr.R. 477, 296 S.W. 1095, 1096–1097 (1927).[11]

Though the Framers were motivated by excessive intrusions experienced as colonists under the English common law, it seems to be generally accepted that the Fourth Amendment protections do not bar police officers "from warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid," *Mincey v. Arizona*, supra, 437 U.S. at 392 and nn. 6 and 7, 98 S.Ct. at 2413 and nn. 6 and 7. *United States v. Barone*, 330 F.2d 543 (CA2 1964), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1965) is the showcase decision often cited, and in *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App. 1973) the Court canvassed it and other authorities to find that "the existence of circumstances in which an unnatural death could have occurred can, therefore, constitute an emergency within the rule of *United States v. Barone, supra*," *id.*, at 946–947. And more recently in *Bray v. State*, 597 S.W.2d 763 (Tex.Cr.App.1980), the Court revisited the emergency doctrine and found that a search upon warrantless entry "may be justified by a need to act immediately to protect or preserve life or to prevent serious bodily injury," *id.*, at 764.

As is true of every warrantless entry into a private residence, the burden of proof is on the State to demonstrate that "the exigencies of the situation made that course imperative," *McDonald v. United States*, 335 U.S. 451, 455–456, 69 S.Ct. 191, 193–194, 93 L.Ed. 153 (1948); *Bray v. State*, supra, at 765, n. 1. In assessing an officer's belief that a warrantless entry is imperatively justified by an emergency, courts must use an objective standard of reasonableness. *Bray v. State*, supra, at 765. Still,

"there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails," *Camara v. Municipal Court*, 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1734–1735, 18 L.Ed.2d 930 (1967); *Bray v. State*, supra, at 769. Just as a search may not be justified by what it produces, so an exigent entry on a claim of emergency is good or bad in law the instant it is made, rather than being affected by whatever condition is found inside. See *United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948), quoted approvingly in *Ker v. California*, 374 U.S. 23, n. 12, at 40–41, 83 S.Ct. 1623, n. 12, at 1633–1634, 10 L.Ed.2d 726 (1963).

On balance, though not without some difficulty, we find the forced entry was justified. Every indication was that appellant was in his house, but could not or would not respond to voices of and knocking by his kin. While Dorner was ambivalent about it, Frank Janicek consistently urged that they get into the residence of his brother to "see if he had been shot." His expressed concern may well have arisen more from intimate knowledge and understanding of his brother's psychiatric history than vague reports of a gunshot earlier that morning, but whatever its basis the Sheriff could have reasonably believed the concern was genuine, and the likelihood of injury was founded. Demurring to acting without a warrant, Sheriff Broadus did move after Dorner discovered enough of his courage to make the entry with Frank Janicek and the Sheriff at his side. Though still with unwarranted reluctance, since he harbored no intent to seize or arrest appellant should he be found in his house, what the Sheriff ultimately did is inherent in the very nature of his duties.[12]

11. The Court quoted favorably from a federal opinion: "The inviolability of the accused's home is to be determined by the facts, not by rumor, suspicion, or guesswork."

12. See Moses, Criminal Defense Sourcebook 297. "It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means." Article 2.13, V.A.C.C.P. The Sheriff, particularly, "shall be a conservator of the peace in his county." Article 2.17, V.A.C.C.P. See also Articles 6.05, V.A.C.C.P., duty to prevent threatened injury, and 6.06, V.A.C.C.P., duty to prevent one from injuring himself.

As in *Mincey v. Arizona*, supra, 437 U.S. at 392–393, 98 S.Ct. at 2413–2414:

"We do not question the right of the police to respond to emergency situations. * * * 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [citations omitted] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [citations omitted]"

Grounds of error one through ten are overruled.

█ The last ground of error contends that in this circumstantial evidence case the proof is insufficient to support the jury verdict and court judgment of guilty. Without reviewing it all, suffice to say that the testimony of two eyewitnesses demonstrated the killing; of the two projectiles recovered from the body of the deceased; the death-causing one retrieved from her head was shown to have been fired by the .22 caliber rifle found in appellant's home, as were two spent shells collected at the scene; the automobile that fled from the location matched that which was soon seen in the driveway of the home of appellant; there was a history of acts of violence and recent threats had been voiced by appellant against the life of his estranged wife; finally, appellant's own acts and condition in the seclusion of his locked home suggest self-imposed retribution for what he had done in Temple. The eleventh ground of error is overruled.

The judgment of conviction is affirmed.