David Allen ROEDER, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–87–00811–CR.

Court of Appeals of Texas,
Houston (1st Dist).

Dec. 29, 1988.

Rehearing Denied April 6, 1989.

Rick Brass, Houston, for appellant.

John B. Holmes, Dist. Atty., Timothy G. Taft, Asst. Dist. Atty., Harris County, for appellee.

Before JACK SMITH, SAM BASS and DUNN, JJ.

## OPINION

JACK SMITH, Justice.

The trial court convicted appellant of first degree murder upon his plea of nolo contendere and sentenced him to confinement for life. Appellant raises five points of error.

■ The State contends that this Court does not have jurisdiction because of defects in appellant's notice of appeal under Tex.R.App.P. 40(b)(1). We note that appellant has filed a supplemental notice of appeal that complies with the rule; therefore, we have jurisdiction to consider the appeal.

Appellant was initially charged and convicted of capital murder for his role in a robbery, kidnapping, and murder plot that claimed the lives of three victims. The Texas Court of Criminal Appeals reversed his first conviction without ruling on the motion to suppress issue. 688 S.W.2d 856. That issue is raised here in his appeal from his retrial and second conviction.

On January 23, 1978, appellant, Claude Wilkerson, and Mark Cass went to the home of Don Fantich. Under gunpoint, Fantich opened his safe and gave Wilkerson the cash inside. While they were there, Dr. William Fitzpatrick called and was told by Wilkerson to come by the house in hopes that he would be bringing drugs to Fantich. After Fitzpatrick arrived, Fantich and Fitzpatrick were taken in Fantich's car to a jewelry store owned by Georgiana Rose. Cass stayed outside in the car with Fitzpatrick while the others went into the jewelry store. They robbed the store, abducted Rose, and all three of the victims were taken to appellant's apartment. Appellant's roommate, Bobby Avila, arrived and agreed to help watch the hostages. After a discussion, it was decided that the hostages should be taken to appellant's parents' ranch in Shiner, Texas. Appellant, Avila, and Cass took them to the ranch.

The next day appellant and Cass went into town and tried to reach Wilkerson by

telephone. On the way back to the ranch, they purchased a bag of lime. When they returned, appellant, Cass, and Avila decided that they would have to shoot the hostages. Appellant and Cass chose a place to bury them and dug a hole. The three of them then took the hostages to the hole. They agreed that each would shoot one of the hostages. On a signal, they fired. Appellant shot Fitzpatrick; Avila shot Rose; Cass shot Fantich. They put the bodies into the hole, put lime on the bodies, and buried them. They left the jewelry and guns in the attic of the house and returned to Houston. On the way back to Houston, they burned Fantich's car.

On January 26, 1978, Wilkerson told them to leave town and gave appellant $300. Appellant and Cass returned to the ranch, covered the grave with some branches, buried the jewelry and guns in several locations in the barn, and left for Grand Junction, Colorado, where both were later arrested.

In his first point of error, appellant contends that the trial court erred in admitting evidence seized during an illegal, warrantless entry into his apartment by police in violation of his rights under the Texas and United States constitutions.

During the afternoon of January 27, 1978, Claude Wilkerson confessed to his participation in the robbery and kidnapping of Fantich, Fitzpatrick, and Rose. He also implicated appellant in the crimes and told police that the last time he saw the victims was on the night of the robbery at appellant's apartment, four nights earlier. About 8 p.m., Wilkerson took the police to the apartment, but the officers did not attempt to enter the apartment at that time.

Around midnight, the officers returned to appellant's apartment purportedly in search of the victims although the officer testified that he believed that they were probably dead. The police did not have a warrant, nor is there an explanation in the record as to why they had not obtained one.

Lights were on in the apartment, and music was being played loudly. After no one responded to their knocks, the police went to an upstairs apartment where appel-

lant's sister lived. Her name had been discovered on a mail box. She told the officers that appellant had gone to Grand Junction, Colorado, but she did not know whether Avila (appellant's roommate) was in the apartment.

The officers contacted the apartment manager to open the apartment; however upon entry, no one was found. The officers then called for a special investigator to conduct a thorough search of the apartment. In the search of the apartment, the officers recovered a gold chain with the price tag on it, duct tape that had been used and thrown away, and registration papers for appellant's car. Around 2:30 a.m. January 28, 1979, during the officers' search, Avila returned to the apartment and was placed under arrest.

■ Appellant correctly points out that a warrantless search is permissible only in rare circumstances. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Appellant argues that the State has failed to meet its burden to prove that this search should fall within the emergency exception. *Bray v. State*, 597 S.W.2d 763, 765 (Tex.Crim.App.1980). In support of this, he argues that Wilkerson showed the officers the apartment four hours before they returned to make the search, the officer stated that he thought the victims were probably already dead, and the victims were last seen at the apartment four days earlier. These facts, he contends, do not fit within the emergency exception. He also argues that even if the initial entrance was justified under the exception, the "emergency" ceased when the officers discovered that no one was in the apartment. We agree that the subsequent extensive warrantless search that produced the evidence at issue was illegal.

The primary purpose of the fourth amendment is to protect citizens from unauthorized intrusions into their homes. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Janicek v. State*, 634 S.W.2d 687, 690 (Tex.Crim. App.1982). Police may make a warrantless

entry into a home to aid a person in need of assistance. *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.1963). The Texas Court of Criminal Appeals has recognized the emergency exception to the prohibition against warrantless searches. "A warrantless search may be justified by a need to act immediately to protect or preserve life or to prevent serious injury." *Bray v. State,* 597 S.W.2d 763, 764 (Tex.Crim.App.1980).

We do not believe that the "emergency" in this case rose to the level required to justify a warrantless search. The officer testified that he believed that the victims were probably already dead. The last time they were seen at appellant's apartment was four days earlier. The officer gave no reason why he thought they were still there. In addition, the sense of emergency was not so great as to prompt immediate action upon discovering the location of the apartment. The State has not met its burden. Even if the entry into appellant's apartment could be justified under the emergency doctrine, when no one was found in the apartment, any emergency had terminated, and the extensive search for evidence that followed cannot be justified.

The officer testified that after he discovered that no one was in the apartment, he called an assistant district attorney. He was advised to conduct a search of the premises. A crime specialist was brought in to conduct a thorough search of the apartment. When Avila returned approximately two and one half hours after the officers first arrived, the search was still continuing and apparently continued after Avila was arrested. The actions of the officers indicate that the primary purpose of their presence was not the rescue of the victims but the gathering of evidence.

In *Bray,* the fire department was called to send an ambulance to provide aid to a drug overdose victim. The fire department dispatcher contacted the police, and an officer was dispatched. When the officer arrived, the ambulance personnel were outside and reported that the victim was con-

scious and that no immediate danger existed. Notwithstanding that knowledge, the officer entered the apartment and went from room to room until he found the defendant (the object of the first call) in the bathroom with drug paraphernalia. *Bray,* 597 S.W.2d at 766–768. In holding that the evidence should have been excluded, the Texas Court of Criminal Appeals emphasized that an emergency no longer existed and that the officer had alternatives to conducting a warrantless search. *Id.* at 768.

█ In the instant case, the officers had alternatives as well. After entering, they knew that no emergency existed. No one was in the apartment so there was no danger of evidence disappearing. They could have obtained a warrant or waited until Avila eventually returned and then asked for consent to search. The actions taken by the officers were not justified by the circumstances. The presence of emergency circumstances is no more of an invitation to conduct a meticulous search of the premises than the circumstance that a person is arrested in the home. The protections of the fourth amendment require that the scope of the search be limited to the circumstance justifying the warrantless search and no farther. *See Chimel v. California,* 395 U.S. 752, 768–69, 89 S.Ct. 2034, 2042–43, 23 L.Ed.2d 685 (1969). We hold that the search was unlawful.

█ The State argues that any error was harmless in light of the small amount of evidence recovered and the overwhelming amount of evidence introduced at trial. The test for harmless error of a constitutional magnitude is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction or affected the punishment. *Chapman v. California,* 386 U.S. 18, 25, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Powell v. State,* 742 S.W.2d 353, 369 (Tex. Crim.App.1987); *see also* Tex.R.App.P. 81(b)(2). In weighing the error, we consider only evidence that is admissible at trial. Although appellant confessed to his participation in the robbery, kidnapping, and murder, those confessions and the fruits of

the confessions are inadmissible for reasons discussed below. The evidence discovered in appellant's apartment provided a direct link between him and the crimes committed. We find that there is a reasonable possibility that the evidence complained of contributed to the conviction or affected the punishment. *Chapman v. California*, 386 U.S. at 25, 87 S.Ct. at 828; *Powell*, 742 S.W.2d at 369.

The first point of error is sustained.

In his second point of error, appellant argues that the written confession and fruits thereof should have been suppressed by the trial court because they were obtained in violation of appellant's rights under the fourth, fifth, and fourteenth amendments to the United States Constitution and article 1, section 9 of the Texas Constitution. He contends that the State has failed to meet its burden to show intervening circumstances sufficient to break the connection between his illegal arrest and detention and the confessions.

▆▆▆▆ Appellant asserts that his warrantless arrest is governed by the Uniform Criminal Extradition Act, which has been enacted by both Texas and Colorado. Tex. Code Crim.P.Ann. art. 51.13, sec. 14 (Vernon 1979); Colo.Rev.Stat. sec. 16–19–115 (1986). The Colorado statute provides that:

> [t]he arrest of a person may be lawfully made also by any peace officer or a private person without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year. When so arrested the accused must be taken before a judge with all practicable speed, and complaint must be made against him under oath setting forth the ground for arrest as in section 16–19–114; and thereafter his answer shall be heard as if he had been arrested on a warrant.

Appellant and Cass were arrested after Houston police issued a radiogram stating that they were wanted for capital murder. Appellant correctly points out that at the time he was arrested he had not been charged with any offense. The radiogram read as follows:[1]

Time Received: Jan. 28 8:51 A.M. 1978
From: West–Homicide
Via: 13 OPR BL
Time Sent: Jan. 28 9:20 A.M. 1978
To: AG AB
Via: 11 OPR BL
Message Number: 673 TXPD HOUSTON 0851
Jan. 28, 1978
WHEN REFERRING TO THIS MESSAGE GIVE MESSAGE NUMBER AND DATE
REGIONS G & H
SPECT ATTN TEXAS NEW MEXICO CALIF COLO
CITY OF GRAND JUNCTION COLO
WANTED BUT NOT CHARGED FOR CAPITAL MURDER CASE L47044 SUBJS INVOLVED IN TRIPLE MURDER AND SHOULD BE CONSIDERED ARMED AND DANGEROUS MAY HAVE IN THEIR POSSESSION LARGE AMOUNT OF JEWELRY AND CASH THE BELOW VEH BELONGS TO # 1 ACTOR BUT SUBJ MAY HAVE ABANDONED THIS CAR BY NOW AND BOUGHT ANOTHER AS SUPPOSED TO HAVE LARGE AMT OF $100 BILLS # 1 ACTOR ALSO SUPPOSE TO HAVE FAMILY IN GRAND JUNCTION COLO # 1 ACTOR DAVID ALLEN ROEDER SM 073057 HAS SANDY SHORT BRN HAIR NOD # 2 ACTOR MARK RICHARD CASS WM 072755 NOD VEH 1966 CHEV MALIBU BLU 77 TX KGH 172 VIN/136696K189920 THIS VEH IS ENTERED ON BCIC–AUTH WEST HOMICIDE
PD HOUSTON TX

CANCELLED BY # 690

Appellant and Cass were seen at a Wendy's restaurant at 2:15 p.m. on January 28, 1978, in Grand Junction, Colorado. Based upon the information in the radiogram and a long distance call to the Houston Police Department in which he was told that

---

**1.** Radiogram shown as in original.

charges had not yet been filed nor had a warrant been issued, Captain Joe Hicks ordered appellant's arrest at that location around 2:21 p.m. Appellant and Cass were booked at 2:45 p.m. for "investigation murder, Texas." Hicks again called notifying Houston police of the arrest and requesting a warrant.

Appellant is correct that his arrest was illegal under the terms of the Uniform Criminal Extradition Act. The arresting officer knew that appellant was not charged with a crime at the time of the arrest. The requirement under the Act that the suspect be charged with an offense or be the subject of a warrant guarantees that a finding of probable cause will have been made. That requirement was not met in this case. The State argues that any unlawfulness was dissipated when charges were filed six hours after appellant's arrest. We do not find that argument compelling particularly in this case where the charges were not issued by a magistrate or by a grand jury, but were sworn to by an assistant district attorney. This does not constitute an independent assessment of probable cause.

The State points out that Colorado law also permits a warrantless arrest when an officer has "probable cause to believe that an offense was committed and has probable cause to believe that the offense was committed by the person to be arrested." Colo.Rev.Stat. sec. 16–3–102 (1986); *People v. Hoinville*, 191 Colo. 357, 553 P.2d 777, 779 (1976). According to *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), if the officer issuing the radiogram possessed probable cause for the arrest, then the Colorado police could have properly arrested appellant even though they were unaware of the specific facts that established probable cause. *United States v. Hensley*, 469 U.S. 221, 230–31, 105 S.Ct. 675, 681–82, 83 L.Ed. 2d 604 (1985).

At the time of the arrest, the arresting officer had no independent information constituting probable cause; he depended upon information gained from officers of the Houston Police Department. The Colo-

rado courts have recognized a fellow officer rule that allows an officer to make an arrest when other officers have sufficient information to constitute probable cause. *People v. Nanes*, 174 Colo. 294, 483 P.2d 958, 962 (1971). The State does not present any cases, however, in which this rule has been applied to facts such as ours where the police officers are of different states or where the Uniform Criminal Extradition Act is applicable. At the time he ordered the arrest of appellant and Cass, the Houston police officer knew of the confession made by Wilkerson to the robbery and kidnapping, the confession made by Avila to the kidnapping and murder, and the evidence removed from appellant's apartment.

Colorado law requires that we look to the reliability of the informants in determining whether probable cause exists for a warrantless arrest.

> The right of an officer to act upon information given to him by a fellow officer is premised upon the latter's possession of trustworthy information. If, however, the fellow officer does not in fact possess reliable information, the arrest by another officer, which has been predicated upon an unfounded belief that probable cause exists, cannot stand after the fellow officer's information is shown to have been unreliable.

*People v. Saars*, 196 Colo. 294, 584 P.2d 622, 625 (1978) (citation omitted). In *Saars*, the Colorado Supreme Court indicated that a participant in the crime is not a reliable source unless there are factors demonstrating the informant's credibility:

> Thus we must determine whether Weidmaier can be characterized as a citizen-informant within this rule [that a citizen is presumed to be credible and the information reliable]. Although Weidmaier led the defendant to the apartment initially, his purpose was to participate in a narcotics purchase and he had neither any connection with the violent crimes which followed nor any reason to anticipate them. He escaped and voluntarily contacted the police as soon as he was able, openly identified himself and relayed his information without any motive of revenge or desire to receive either payment or concessions from the police.

*Saars,* 584 P.2d at 626. Under the circumstances of their confessions, Wilkerson and Avila cannot be considered citizen-informants under Colorado law, and, therefore, the information contained in their confessions cannot be presumed to be reliable. The State has not met its burden of proving probable cause under Colorado law. Moreover, we note that the evidence from appellant's apartment was illegally obtained.

The State also argues that the arrest was permissible under *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In that case, the United States Supreme Court held that "police officers may stop and briefly detain a person who is the subject of a 'wanted flyer' while they attempt to find out whether an arrest warrant has been issued" in certain circumstances. *Id.* at 223, 105 S.Ct. at 677. In the case at hand, however, the Colorado officers knew that no warrant had been issued, and they arrested appellant without any independent probable cause.

 We find that appellant was illegally arrested; however, it does not follow that the confession is necessarily tainted. We find that appellant's fifth amendment rights were not violated because he received the *Miranda* warnings on numerous occasions before giving his confession, and he voluntarily relinquished those rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 We next inquire into whether appellant's rights under the fourth amendment were violated. In *Brown v. Illinois,* 422 U.S. 590, 601–602, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975), the Supreme Court outlined the factors that determine whether the confession was a product of the defendant's free will sufficient to purge the primary taint of the illegal arrest:

1. whether *Miranda* warnings were given;
2. the temporal proximity of the arrest and the confession;
3. the presence of intervening circumstances; and
4. the purpose and flagrancy of the official misconduct.

A finding of voluntariness of the confession is only a threshold requirement. The other factors must also be considered with no single factor being dispositive. *Id.* at 603, 95 S.Ct. at 2261; *see also Self v. State,* 709 S.W.2d 662, 665–666 (Tex.Crim.App. 1986); *Green v. State,* 615 S.W.2d 700, 707 (Tex.Crim.App.1980). The burden is on the State to prove that the confession was not a product of the illegal arrest.

The second factor is the temporal proximity of the confession to the arrest. The interrogation in which appellant confessed began approximately 30 hours after his arrest. We recognize that this is significantly longer than the two-hour period in *Brown,* but we also note Justice Stevens' comments in his concurring opinion in *Dunaway v. New York,* 442 U.S. 200, 221, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824 (1979):

> The temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one.

The most significant of the factors then are the final two.

We find that there were no significant intervening circumstances that would break the causal connection between the arrest and the confession. Appellant was arrested in Grand Junction, Colorado, at 2:21 p.m. on January 28, 1979. At 8:10 p.m. on January 29, 1978, appellant was introduced to officers from the Houston Police Department and an assistant district attorney from Harris County. He was questioned until 1:25 a.m. and returned to a holding cell while his statement was prepared. He was brought out to review his statement at 5:00 a.m., and he signed it at 5:17 a.m. Between his arrest and the making of his confession, appellant was held without being taken before a magistrate or having any consultation with counsel, and he did not initiate the talks that led to his confession.

The State argues that any taint on the confession was dissipated by the filing of a complaint against appellant around 9:30

p.m., approximately six hours after his arrest. We do not agree. In *Taylor v. Alabama*, 457 U.S. 687, 692–693, 102 S.Ct. 2664, 2668–69, 73 L.Ed.2d 314 (1982), the State argued that the filing of an arrest warrant between the time of the defendant's arrest and his confession was an attenuating event. The Supreme Court distinguished that case from *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed. 2d 152 (1972) (where the defendant was taken before a magistrate, was read his rights, and bail was set), noting that the arrest warrant was filed *ex parte* based upon fingerprints taken from the defendant immediately after his arrest. The Court found that the attenuation was insufficient to break the taint of the illegal arrest. The complaint in the present case has even less merit than the warrant in *Taylor*. The complaint was not presented to a magistrate or any other judicial body, rather it was sworn to by an assistant district attorney. There was never a judicial assessment of probable cause by a neutral magistrate, as required by law. The complaint was not an intervening circumstance.

The final factor to be considered is the purpose and flagrancy of the police misconduct. While the State is correct that the Texas Court of Criminal Appeals placed great emphasis on this particular factor in *Self*, the court also emphasized that no *unconstitutional* police misconduct occurred because there had been probable cause to arrest. *Self*, 709 S.W.2d at 668. Those are not our facts. The Colorado officers were explicitly told that no warrant had been issued or charges had been filed. The purpose of the arrest was to hold appellant while the investigation continued. Although the other confessions linking appellant to the crime had been obtained the night before appellant was arrested, the Houston police did not seek an arrest warrant. Appellant was held without being taken before a magistrate. He was not told that a public defender was available or that the public defender had tried to see him. Appellant was not taken before a Colorado magistrate until after his signed confession was obtained, and he was not indicted until February 1, 1978, four

days after his arrest. While the police misconduct in this case does not rise to the level of the flagrancy in *Brown*, we find that in considering all of the factors the taint was not removed under either Texas or United States constitutional standards. Appellant's motion to suppress his written confession should have been granted.

■ Appellant's fourth point of error also contends that the trial court erred in overruling his motion to suppress his written confession on the further basis that the State failed to sustain its burden of showing that appellant made an intelligent and knowing waiver of his right to counsel during custodial interrogation, and, therefore, the confession was obtained in violation of the Texas Constitution. Appellant relies primarily on *Dunn v. State*, 696 S.W.2d 561 (Tex.Crim.App.1985), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1478, 89 L.Ed.2d 732 (1986), which held that there can be a voluntary statement without an intelligent and knowing waiver of counsel during custodial interrogation. The question that was presented to that court was whether the failure of law enforcement officials to notify the accused that counsel, who has been retained by a third party or parties and is close at hand, negates the knowing and voluntary nature of the waiver of the right to presence of counsel pursuant to *Miranda*, and its progeny. *Dunn*, 696 S.W.2d at 567. The Court outlined factors to be considered when weighing the validity of a waiver of right to counsel:

1. the relationship of the suspect to the attorney,
2. the extent of the knowledge possessed by the authorities,
3. the conduct of the authorities,
4. the nature of the attorney's request, and
5. the background, experience and conduct of the accused.

*Dunn*, 696 S.W.2d at 568. After noting that the attorneys did "everything short of kicking in the interrogation room door to gain access to appellant," the Court held that the "combination of circumstances clearly vitiates any claim that a waiver of counsel was knowing and voluntary." *Dunn*, 696 S.W.2d at 569 (quoting *Burbine v. Moran*, 753 F.2d 178, 187 (1st Cir.1985)).

The State argues that since both of these cases were decided, the United States Supreme Court has decided the issue to the contrary in *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). However, the *Dunn* decision was also based upon state constitutional grounds, *Dunn*, 696 S.W.2d at 570, and it is those that are urged here and in the trial court. The United States Supreme Court pointed out in *Moran v. Burbine* that its holding did not disable "the States from adopting different requirements for the conduct of its employees and officials as a matter of State law," because its holding applied to only the fifth amendment of the United States Constitution. *Moran*, 106 S.Ct. at 1145.

Therefore, the law as stated in *Dunn* is binding upon this Court. In considering the *Dunn* factors we note the following:

1. Contrary to *Dunn*, at the time of the confession, appellant was under arrest, had been in custody of police officers for 30 hours, and had a complaint filed against him.[2]

2. Colorado law instructs that a public defender, upon request, "*shall* be permitted to communicate with any person in custody to determine whether that person has counsel and, if the person desires that the public defender represent him, to make an initial determination as to whether the person is indigent." C.R.S. sec. 16–3–402(3)(1986). [Emphasis added.]

3. At the request of Houston police officers, Captain Hicks ordered that no one was to see appellant unless he requested an attorney.

4. On January 29, 1978, around noon, public defender Edward Lipton requested to see appellant and was denied access. Lipton was told he could go back into the jail to see appellant, but he declined for confidentiality reasons. Lipton testified that "although the jail is a closed cell and the cells are closed from the outside, once I'm inside there's a corridor there that opens and I would be talking not only to a particular defendant but anyone

within earshot and I feel that is bad practice and I'm certain my client would have lost the confidentiality of our discussion so I declined." He was then told that he could not see either appellant or Cass. Lipton also testified that he had never been denied access to a defendant.

5. Over the next few hours, Lipton attempted to gain access to appellant by contacting Hicks, District Judge William Ela, Mesa County District Attorney Clarence Farine, the Colorado State Public Defender in Denver. Lipton also attempted to contact the Chief Justice of the Colorado Supreme Court.

6. Lipton asked Hicks that appellant not be interviewed at all without him being present.

7. District Judge Ela determined that appellant had $400 that could be used to hire an attorney. There was conflicting testimony over whether that money was being held as evidence. Lipton testified that $400 was not enough money to hire an attorney for either an extradition matter or homicide.

8. Appellant was not advised that an attorney was attempting to see him.

9. Appellant was 20 years old and a high school graduate. He had no previous convictions.

10. Appellant began making his statement after Houston officials arrived around 8:30 p.m.

In setting out the factors to be considered, the *Dunn* court stated that all pertinent facts and circumstances in the case should be examined. *Dunn*, 696 S.W.2d at 568. The conduct of the Houston police officers and the district attorney's office throughout the investigation of these crimes reflects an apparent intent to gather as much evidence as possible without regard to procedural safeguards that protect the rights of the accused. We recognize that the relationship between Lipton, the public defender, and the appellant was not the same as that in the *Dunn* case, but we do not think that is solely determinative. The Colorado officers knew that the public

---

**2.** The point at which Dunn was under arrest is not clear from the court's opinion. It is clear, however, that Dunn voluntarily appeared at the police station for questioning. *Dunn*, 696 S.W. 2d at 564–565.

defender had a statutory right to communicate with anyone in custody; this was denied at the request of Houston officers. Appellant was not told that an attorney was available to him, nor was he told that the $400 was not being held as evidence. Appellant had no prior convictions, and there is no evidence that he had a great deal of knowledge or sophistication about the criminal justice system. Based upon all of the circumstances of the case, we hold that appellant did not make a knowing and intelligent waiver of his right to counsel, and his motion to suppress his confession should have been granted.

Points of error two and four are sustained.

■■■ In his third point of error, appellant contends that his motion to suppress his oral confession should have been granted on the basis of Texas and United States constitutional grounds. After appellant made his statement in Colorado, he and Cass were flown back to Houston shortly after midnight on January 30, 1978. After arriving back in Houston at 7 a.m. (6 a.m. Colorado time), appellant and Cass were given breakfast and then driven to appellant's parent's ranch in Shiner, Texas. The officers testified that they arrived around 9 a.m. At the ranch, appellant and Cass separately pointed out where the weapons used and jewelry stolen had been buried in four different places. Appellant also showed the police other evidence that had been hidden in the house. The officers had previously searched the ranch under the direction of Avila, and none of this evidence had been recovered.

Although appellant had been taken before a Colorado magistrate on extradition matters, this one intervening circumstance and the passage of time are not sufficient to remove the taint of the illegal arrest under either Texas or United States constitutional standards. Appellant's motion to suppress his oral confession should have been granted under the progeny of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Point of error three is sustained.

■■■ In his final point of error, appellant asserts that the evidence seized in the search of his apartment and his confessions should not have been admitted because these were "tainted fruit" of Claude Lee Wilkerson's confession which the Texas Court of Criminal Appeals ruled was illegally obtained. *Wilkerson v. State*, 657 S.W.2d 784 (Tex.Crim.App.1983). Before a fourth amendment claim can be raised, an appellant must establish standing to object to the alleged illegal conduct on the part of the police. Co-defendants have no special standing. *Alderman v. United States*, 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1968). Appellant has cited no cases to this Court that support this point of error. While the rights of Claude Lee Wilkerson were violated, appellant has not demonstrated to this Court why he should have standing to object on this basis under this point of error.

The fifth point of error is overruled.

The judgment of the trial court is reversed, and the cause is remanded for a new trial.