# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00005-CR

**Mario Gonzalez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 007834, HONORABLE JULIE KOCUREK, JUDGE PRESIDING

## O P I N I O N

After the trial court denied his motion to suppress, Mario Gonzalez pleaded guilty to the offense of possession of a controlled substance in an amount more than four grams but less than two hundred grams. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d) (West 2003). The trial court sentenced him to four years' imprisonment. In his only issue in this out-of-time appeal,[1] Mario

---

[1] We dismissed Mario Gonzalez's original appeal for want of jurisdiction because his timely notice of appeal did not contain the necessary statement that the substance of the appeal was raised by written motion and ruled on before trial, and his amended notice of appeal correcting the defect was filed late. *Gonzalez v. State*, No. 03-03-064-CR, 2002 Tex. App. LEXIS 3930 (Tex. App.—Austin 2002, pet. ref'd). The court of criminal appeals has subsequently held that an appellant may correct this defect at any time until the appellant's brief is filed. *See Bayless v. State*, 91 S.W.3d 801, 806 (Tex. Crim. App. 2002). Mario Gonzalez filed a petition for a writ of habeas corpus asserting that the late filing of the amended notice of appeal denied him the effective assistance of counsel. The court of criminal appeals granted habeas corpus relief and allowed an out-of-time appeal. *Ex Parte Gonzalez*, No. 74, 832 (Tex. Crim. App. Nov. 19, 2003).

Gonzalez contends that the trial court erred by overruling his motion to suppress the fruits of a warrantless search of his apartment. Because the initial search of Mario Gonzalez's apartment was not justified under the emergency doctrine, we reverse the trial court's judgment of conviction and remand for further proceedings.

## BACKGROUND

Mario Gonzalez and his brother Alexander Gonzalez lived together in apartment 114 at 1221 Barton Hills Drive in Austin. In his motion to suppress, Mario Gonzalez challenged the warrantless search of the apartment after Austin police officers responded to a 911 call and found Alexander Gonzalez bleeding from a stab wound. Mario Gonzalez was not present when the police arrived or at the time of the search. We will summarize the events leading up to the search because they form the basis of our determination that the entry of the apartment was not justified under the emergency doctrine.

Alexander Gonzalez called his friend Arleen Aleman in the early morning hours of July 26, 2000, asking for help. He directed her to his apartment while talking on a mobile phone, and she discovered him bleeding in a common area of the apartment complex. Aleman called 911 for help. Austin police officer Tom Owens arrived before EMS personnel. He was told by the dispatcher that the 911 call originated from apartment 114. As he approached the closed door of the apartment, he heard voices around the corner and found Alexander Gonzalez and Aleman standing together in the courtyard. Both had blood on their clothes.

2

Officer Owens testified at the suppression hearing that Alexander Gonzalez and Aleman were evasive in answering his questions about what happened. Once EMS personnel arrived, the officer spoke directly with Aleman who informed him that Alexander Gonzalez had been stabbed on the left side of his chest. Soon after the EMS personnel arrived, Austin police officer Gerald Wines arrived to assist Owens. Both officers continued to question Alexander Gonzalez and Aleman about what happened. Alexander Gonzalez did not answer questions about what happened, and Aleman explained that she did not know.[2] Both officers described Alexander Gonzalez's behavior as agitated and requiring their attention.

Before he was transported to the hospital, Alexander Gonzalez gave Aleman his keys and asked her to lock his apartment door. Aleman complied and when she returned, Officer Wines demanded the keys. He explained that he needed to check the apartment to make sure no one else was hurt or injured and that, if she did not give him the keys, she would be interfering with his duties. Officer Wines then grabbed the keys from Aleman's hand.

Officer Wines approached the Gonzalez apartment and looked in the window. He did not see anyone inside. After obtaining approval from his supervisor, he unlocked the apartment door, announced his presence, and entered. Inside the apartment, Officer Wines found blood on one of the chairs and discovered a bloody knife in the kitchen sink. He then went into one of the bedrooms and observed a scale, powder, and a straw on top of a dresser. He looked into an open

---

[2] Aleman testified at the suppression hearing that she told the officers prior to the search that, although she did not know what happened, Alexander Gonzalez had been very depressed and the stab wound may have been self inflicted.

dresser drawer and observed a plastic bag containing a white powdered substance. Officer Wines informed his supervisor of what he found, then left the apartment and locked the door. The police obtained a search warrant based on Officer Wines's discovery and seized the evidence which formed the basis of the charge against Mario Gonzalez.

## DISCUSSION

In his only issue on appeal, Mario Gonzalez contends that Officer Wines's initial warrantless search of the apartment was not justified under the emergency doctrine. Therefore, the trial court erred by overruling his motion to suppress because the warrant obtained by the police was based on information learned through Officer Wines's illegal search. *See Nilson v. State*, 106 S.W.3d 869, 872 (Tex. App.—Dallas 2003, no pet.) (where illegal warrantless search provides basis for search warrant, evidence obtained pursuant to search warrant suppressed); *State v. Guo*, 64 S.W.3d 662, 668 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

In reviewing a ruling on a motion to suppress we give almost total deference to the trial court's determination of historical facts and review the court's application of search and seizure law that does not turn upon credibility and demeanor *de novo*. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); *Hayes v. State*, 132 S.W.3d 147, 151 (Tex. App.—Austin 2004, no pet.). When the trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record. *Id*. We must affirm the trial court's ruling on a motion to suppress if it can be upheld on any valid theory of law applicable to the case—even if the trial court did not base its decision on that theory.

4

*State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *Romero v. State*, 800 S.W.2d 539, 543-544 (Tex. Crim. App. 1990).

It is a cardinal principle of Fourth Amendment law that the search of a residence without a warrant is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Roth v. State*, 917 S.W.2d 292, 299 (Tex. App.—Austin 1995, no pet.). The reverence for an individual's right to privacy in his house is embedded in the Anglo-American law and was well established prior to the adoption of the Fourth Amendment. *Miller v. United States*, 357 U.S. 301, 313 (1958); *see Payton*, 445 U.S. at 601 ("the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic"); *Janicek v. State*, 634 S.W.2d 687, 690 (Tex. Crim. App. 1982) (physical entry of home is chief evil against which Fourth Amendment was directed).[3] This presumption applies to all searches conducted outside of judicial process, "subject only to a few specifically established and well-delineated exceptions." *Mincey*, 437

---

[3] The deep roots of the Fourth Amendment's protection of the home were discussed by the United States Supreme Court through a citation to remarks attributed to William Pitt, Earl of Chatham, made in 1761 to Parliament while debating searches incident to the enforcement of an excise on cider:

> "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!"

*Miller v. United States*, 357 U.S. 301, 307 (1971); *see also Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B.1603) ("the house of every one is to him as his castle and fortress"). "Similarly Section 9 of our own Bill of Rights has been held to protect against intruding into so lowly an abode as a tent." *Janicek v. State*, 634 S.W.2d 687, 690-91 (Tex. Crim. App. 1982); *see Chapin v. State*, 296 S.W. 1095, 1096-97 (Tex. Crim. App. 1927); *Roth v. State*, 917 S.W.2d 292, 299 (Tex. App.—Austin 1995, no pet.).

U.S. at 390; *Katz v. United States*, 389 U.S. 347, 357 (1967). The general requirement of a warrant is not to be dispensed with lightly, and it is the burden of those seeking an exception to show the need for it. *United States v. Robinson*, 414 U.S. 218, 243 (1973); *see Russell v. State*, 717 S.W.2d 7, 9-10 (Tex. Crim. App. 1986); *Janicek*, 634 S.W.2d at 691; *Roth*, 917 S.W.2d at 299.

There is no dispute that the initial search in this case was conducted without a warrant. The State contended at the suppression hearing that the search of the Gonzalez apartment fell within the emergency doctrine exception to the general requirements of the Fourth Amendment. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *Mincey*, 437 U.S. at 392; *Janicek*, 634 S.W.2d at 691. The court of criminal appeals noted in *Janicek* that it seems to be generally accepted that the Fourth Amendment protections do not prohibit warrantless entries and searches when police reasonably believe that a person within is in need of immediate aid. *Id.* at 691.

The court more recently discussed the emergency doctrine in *Laney v. State* as an aspect of the police's community caretaking function. *See* 117 S.W.3d 854, 861-62 (Tex. Crim. App. 2003). Under the emergency doctrine, an officer's warrantless search is permissible if the officer has an immediate, reasonable belief that he must act to protect or preserve life or avoid serious injury. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Laney*, 117 S.W.3d at 861. When the police come upon the scene of a homicide, they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. *Mincey*, 437 U.S. at 392.

Although police may seize evidence found in plain view when they enter a residence pursuant to the emergency doctrine, *see Brimage v. State*, 918 S.W.2d 466, 501 n.5 (Tex. Crim. App. 1996), the motivation for the entry must be "totally divorced from the detection, investigation, or

6

acquisition of evidence relating to the violation of a criminal statute." *Laney*, 117 S.W.3d at 860 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)); *see also Corbin v. State*, 85 S.W.3d 272, 281 n.7 (Tex. Crim. App. 2002) (Cochran, J., concurring) (emergency search must not be primarily motivated by intent to arrest and seize evidence, and it is essential that courts be alert to possibility of subterfuge). The scope of the search must also be strictly circumscribed by the emergency which justified its initiation. *Mincey*, 437 U.S. at 393; *Laney*, 117 S.W.3d at 862.

We apply an objective standard of reasonableness, taking into account all of the facts and circumstances known to the police at the time of the search, in determining whether a search is justified under the emergency doctrine. *See Laney*, 117 S.W.3d at 862; *Brimage*, 918 S.W.2d at 501. We independently scrutinize the facts without regard to the subjective conclusions of the police. *Johnson v. State*, 722 S.W.2d 417, 419 (Tex. Crim. App. 1986). Given the greater expectation of privacy in a private residence, a warrantless search under the emergency doctrine will only be justified in the most unusual circumstances. *Wright v. State*, 7 S.W.3d 148, 152 (Tex. Crim. App. 1999); *see United States v. Robinson*, 414 U.S. 218, 243 (1973) ("Exceptions to the warrant requirement are not talismans precluding further judicial inquiry whenever they are invoked . . . but rather are jealously and carefully drawn.").

In order to evaluate the trial court's ruling on the applicability of the emergency doctrine to the search of the Gonzalez apartment, we must review the facts and circumstances known to the officers at the time of the search to determine: (1) whether the officer's entry into the Gonzalez apartment was totally divorced from the detection, investigation, or acquisition of evidence, (2) whether there was an immediate, objectively reasonable belief that it was necessary to enter the

7

Gonzalez apartment in order to protect or preserve life or avoid serious injury, and (3) whether the scope of the search was strictly circumscribed by the facts of the emergency. *See Laney*, 117 S.W.3d at 861-62.

Here, Officers Wines and Owens responded to a call for emergency assistance and were directed by the dispatcher to go to the Gonzalez apartment. Once they arrived, they saw Alexander Gonzalez bleeding from a chest wound and Aleman with blood on her clothes. They were informed by Aleman that Alexander Gonzalez had been stabbed. Alexander Gonzalez was agitated and evasive. Although the officers spent considerable time questioning Alexander Gonzalez and Aleman, they were unable to obtain even the most basic account of how Alexander Gonzalez had been stabbed or if anyone else was involved. Despite Alexander Gonzalez's agitated mental state and apparent inability or unwillingness to respond to basic questions by the police, he was coherent enough to instruct Aleman to lock his apartment before he was taken to the hospital.

We first examine whether the search was totally divorced from the goal of detection, investigation, or acquisition of evidence. *See Laney*, 117 S.W.3d at 862. Our independent review of the record reveals no evidence that would show that Officer Wines entered the Gonzalez apartment for any reason other than his stated purpose of making sure that no one else was injured. By comparison, in *Green v. State*, police responded to a report of a chemical smell at an apartment complex. *See* 666 S.W.2d 291, 292 (Tex. App.—Houston [14th Dist.] 1984, no pet.). The police identified the location of the smell, "immediately recognized the smell of ether and formed the opinion that there was a methamphetamine lab operating inside the apartment." *Id*. at 293. In *Green*, the court correctly held that the search was not justified under the emergency doctrine

8

because the police identified the smell as a methamphetamine lab, not a dangerous gas leak. *Id*. at 293. The evidence showed that the intent of the officers in entering the apartment was to enforce the criminal statute prohibiting the manufacture of methamphetamine, not to preserve or protect life. *See id*. (police may not enter based on "contrived emergency"). In this case, there is no evidence that Officer Wines suspected that there were drugs in the apartment or that he otherwise entered the apartment for the purpose of detection, investigation, or acquisition of evidence.

Because we find that the search of the Gonzalez apartment was conducted as a good faith response to a perceived emergency, we next determine whether Officer Wines's subjective apprehension of an emergency was objectively reasonable. Was there an immediate, objectively reasonable belief that entry and search of the apartment was necessary to protect or preserve life or avoid serious injury? *Laney*, 117 S.W.3d at 861; *Mincey*, 437 U.S. at 392. Citing the fact that Alexander Gonzalez was found outside of his apartment bleeding from a stab wound, the State has consistently argued that the police formed a reasonable belief that Alexander Gonzalez had been the victim of a violent crime and that they were entitled to search for additional victims or the perpetrator. *See Mincey*, 437 U.S. at 392. Mario Gonzalez stresses the fact that both officers candidly admitted in their testimony that they had no articulable facts which indicated that Alexander Gonzalez was stabbed inside the apartment or that the perpetrator or other victims were inside. He contends that without such information the belief that there was an emergency necessitating warrantless entry into the apartment was not objectively reasonable.

Reviewing the evidence without regard to the subjective conclusions of the police, we note that the officers did have some indication that Alexander Gonzalez may have been in the

9

apartment because they were informed that the 911 call was traced back to the Gonzalez apartment. It was also reasonable to suspect that Alexander Gonzalez was the victim of a violent crime. Even though Aleman informed the officers that the stab wound may have been self inflicted, she stated that she did not actually know what happened, and Alexander Gonzalez provided no further information.

We cannot conclude, however, that Alexander Gonzalez's reticence to give details or his request that Aleman lock his door prior to being taken to the hospital provided any evidence that another victim or the perpetrator may have been lurking in the apartment. At best, Alexander Gonzalez's uncooperative behavior suggested that he did not want the police involved. Inferring that his lack of cooperation with the police indicated that there was another victim or the perpetrator of the alleged stabbing in the apartment would be speculation. Furthermore, Alexander Gonzalez's request to lock his door was a reasonable action in light of the fact he was being taken to the hospital. The interest in the privacy and protection of one's home is a fundamental American value and a mainstay of our legal system. *See Payton*, 445 U.S. at 601; *Miller*, 357 U.S. at 313. Nor can we conclude that his desire to protect his home from intrusion was evidence of an emergency inside. Indeed it would be odd to want to lock the perpetrator in and there was no suggestion or hint of another victim.

In *Laney*, the court of criminal appeals held that a warrantless entry was justified under the emergency doctrine when officers were aware of specific facts that indicated a need to protect or preserve life or prevent serious injury. *See* 117 S.W.3d at 863. Sheriff's deputies were arresting Laney for a disturbance when they saw two boys, aged ten to twelve, come out of the

10

Laney's darkened trailer and then go back inside. *Laney*, 117 S.W.3d at 856. It was after midnight and Laney informed the deputies that the children were not his. *Id*. One of the children then came out of the trailer and the other remained inside. *Id*. The deputies entered the trailer to retrieve the second boy and discovered contraband. *Id*. The court of criminal appeals relied on the emergency doctrine to justify the deputies' warrantless search of the house. *Id*. at 862-63. The deputies didn't enter the trailer based on speculation that there might be someone inside in need of protection: they saw a young boy go inside and felt there would be a substantial risk of harm if he was left there. *See id*. at 863.

By contrast, nothing in this record provides more than an unsupported hunch that others might have been involved or that they could be found in the Gonzalez apartment. Indeed, the only explanation proffered for Alexander Gonzalez's wound was that he might have stabbed himself. "The inviolability of the accused's home is to be determined by the facts, not by rumor, suspicion, or guesswork." *Janicek v. State*, 634 S.W.2d at 691 n.11. Giving deference to the trial court's determination of historical facts in favor of its ruling on the motion to suppress, we do not find that the facts support an immediate, objectively reasonable *belief* that another victim or the perpetrator of the stabbing would be found in the apartment. *See Laney*, 117 S.W.3d at 861; *Mincey*, 437 U.S. at 392. Absent such belief, the search cannot be justified under the emergency doctrine. *Id*.[4]

---

[4] Because we hold that the officers did not possess an immediate, objectively reasonable belief that it was necessary to enter the Gonzalez apartment in order to protect or preserve life or avoid serious injury, we need not examine whether the scope of the search of the Gonzalez apartment was sufficiently circumscribed by the facts of the emergency. *See Laney v. State*, 117 S.W.3d 854, 862 (Tex. Crim. App. 2003).

11

The State has not argued, and we do not find any other applicable exception to the presumption that a warrantless search of a residence is prohibited by the Fourth Amendment. We therefore hold that the trial court erred by overruling Mario Gonzalez's motion to suppress and sustain Mario Gonzalez's only issue on appeal.

## CONCLUSION

Because the officers did not have articulable facts that would give them an immediate, objectively reasonable belief that they needed to enter the locked apartment to protect or preserve any life or find a perpetrator, it was error to overrule the motion to suppress. We sustain Mario Gonzalez's sole issue on appeal, reverse the trial court's judgment of conviction, and remand for further proceedings.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Pemberton:  Opinion by Justice B. A. Smith;
    Dissenting Opinion by Justice Pemberton

Reversed and Remanded

Filed:  October 28, 2004

Publish

12