John Anson WHITE, Appellant

v.

The STATE of Texas, State.

No. 2–05–357–CR.

Court of Appeals of Texas,
Fort Worth.

Aug. 10, 2006.

---

Mick Meyer, Denton, for Appellant.

Kathleen Walsh, Denton, for Appellee.

Panel B: DAUPHINOT, HOLMAN, and GARDNER, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

Appellant John White appeals his conviction for assault—family violence. A jury found Appellant guilty, and the trial court assessed his punishment at 240 days'

confinement, suspended for a period of eighteen months, and a $500 fine. In four points, Appellant contends that the trial court erred in denying his motion to suppress, by allowing the State to comment on his failure to testify, by allowing the State to employ a "straw man" theory, and by failing to include the requested instructions in the jury charge. We affirm.

## FACTUAL BACKGROUND

On January 5, 2005, Donna White, Appellant's wife, called 911, but she hung the phone up before providing the dispatcher with any information. Within ten to fifteen minutes, Officer Matthew David Harmuth responded to the address from which the call originated to investigate the source of the phone call. When Officer Harmuth arrived at the house, he approached the front door and a woman, later identified as Donna White, answered the door dressed only in underwear. According to Officer Harmuth, she appeared visibly shaken and terrified and stated that she was "scared." Officer Harmuth noted that she had an injury to her eye. He asked her if anyone else was inside the house, and she informed him that her husband was also there.

Based on his observations, Officer Harmuth informed the woman that he needed to come inside the house, at which point she stepped aside and opened the door. Officer Harmuth followed her through the house and into the bedroom where he found Appellant lying in bed. Officer Harmuth asked Appellant what had happened, and Appellant responded that he and his wife had fought. Officer Harmuth testified that Appellant informed him that he was trying to sleep, his wife was making a lot of noise, and he became mad, but he did not physically hurt her. Officer Harmuth observed a cordless phone broken on the floor, and he asked Appellant what had

happened to the phone. Appellant informed him that he had grabbed the phone from Donna and thrown it because he believed that Donna was trying to call their daughter and he did not want to bother her with their arguing. While Appellant was relaying this story to Officer Harmuth, Donna entered the bedroom and yelled that it was not true.

Officer Wells, a back up officer, arrived at the scene. Officer Wells spoke with Appellant in the kitchen while Officer Harmuth continued to question Donna. In the light, a bruise and knot above Donna's left eye became more visible to Officer Harmuth, and Officer Harmuth observed red marks around her neck. In response to Officer Harmuth's questioning, Donna stated that she was in the bathroom when Appellant became upset with her because she was making noise while he was trying to sleep. Donna informed Officer Harmuth that Appellant had told her that he hated her, hit her with a closed fist above her left eye, grabbed her around the neck, and threw her to the floor. At that point, Donna attempted to dial 911, but Appellant grabbed the phone and threw it, causing it to break. The officers determined that an assault had occurred, it was family violence, and there was still a threat of violence, so the officers placed Appellant under arrest.

Donna refused to give the officers a statement. At trial, Donna testified that on the day in question, she and Appellant were driving down the interstate when Appellant hurt her feelings, so she began "beating on his arm." She testified that, in order to avoid having an accident, his arm "glazed" her temple. At that point, they turned the car around and went home, where Appellant began making bacon and eggs. Donna testified that she wanted to continue to fight, so she started hitting him and grabbing him around the

throat. She testified that she got the red marks on her throat because Appellant had pulled her sweatshirt back. She also testified that she called 911 because she was very hurt and angry, but she thought better about it and hung up immediately. She also testified that she is terrified of police officers. According to Donna, Officer Harmuth continuously asked to be allowed into the house. She told him no, yet he demanded entry, and he entered the house on his own.

## SUPPRESSION OF EVIDENCE

In his first point, Appellant contends that the trial court erred in denying his motion to suppress and in failing to suppress the evidence obtained as a result of Officer Harmuth's warrantless entry into his house.

### 1. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.-Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App. 2000); *State v. Ballard*, 987 S.W.2d 889, 891 (Tex.Crim.App.1999). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *State v. Ballman*, 157 S.W.3d 65, 68 (Tex.

App.-Fort Worth 2004, pet. ref'd). But when the trial court's rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court's rulings on mixed questions of law and fact. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim.App.2005); *Johnson*, 68 S.W.3d at 652–53.

When reviewing a trial court's ruling on a mixed question of law and fact, the court of appeals may review de novo the trial court's application of the law of search and seizure to the facts of the case. *Estrada*, 154 S.W.3d at 607. When there are no explicit findings of historical fact, the evidence must be viewed in the light most favorable to the trial court's ruling. *Id.*

■ We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex.Crim. App.2003), *cert. denied*, 541 U.S. 974, 124 S.Ct. 1883, 158 L.Ed.2d 469 (2004); *Ross*, 32 S.W.3d at 856; *Romero*, 800 S.W.2d at 543.

■ In determining whether a trial court's decision is supported by the record, we generally only consider evidence adduced at the suppression hearing only because the ruling was based on it rather than on evidence introduced later. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim. App.), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually relitigated by the parties during the trial on the merits. *Id.* Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consider-

ation of the relevant trial testimony is appropriate in our review. *Id.*

### 2. Applicable Law

 The State asserts that the warrantless entry into Appellant's house was justified on the basis of exigent circumstances. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App.2005). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id.* Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.*

 Whether a search is reasonable is a question of law that we review de novo. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex.Crim.App.2004). Reasonableness is measured by examining the totality of the circumstances. *Id.* at 63. It requires a balancing of the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Id.* A search conducted without a warrant is per se unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex.Crim.App.), *cert. denied*, 540 U.S. 1004, 124 S.Ct. 536, 157 L.Ed.2d 410 (2003); *see Best*, 118 S.W.3d at 862.

 The emergency doctrine has been formulated to allow warrantless searches that would otherwise be illegal where there is reasonable cause to believe that, absent an immediate search, serious bodily harm or death may result. *Brimage v. State*, 918 S.W.2d 466, 500–01 (Tex.Crim.App.1994), *cert. denied*, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 66 (1996); *see also Georgia v. Randolph*, —— U.S. ——, ——, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 (2006) (noting that "no question has been raised . . . about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur.") The emergency doctrine does not necessarily allow police officers to make warrantless entries and searches every time there is a need to protect or preserve life or prevent serious injury. *Laney v. State*, 117 S.W.3d 854, 863 (Tex. Crim.App.2003). Rather, courts should carefully apply the objective standard of reasonableness when determining whether an officer's warrantless entry and search is justified under the emergency doctrine. *Id.* This objective standard looks at the police officer's conduct and "takes into account the facts and circumstances known to the police at the time of the search." *Colburn v. State*, 966 S.W.2d 511, 519 (Tex.Crim.App.1998); *Brimage*, 918 S.W.2d at 501; *Janicek v. State*, 634 S.W.2d 687, 691 (Tex.Crim.App.1982).

 The motivation for an entry pursuant to the emergency doctrine must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Laney*, 117 S.W.3d at 860; *Brimage*, 918 S.W.2d at 501 n. 5; *Gonzalez v. State*, 148 S.W.3d 702, 707 (Tex.App.-Austin 2004, pet. ref'd); *see also Corbin v. State*, 85 S.W.3d 272, 281 n. 7 (Tex.Crim.App.2002) (Cochran, J., concurring) (emergency

search must not be primarily motivated by intent to arrest and seize evidence, and it is essential that courts be alert to possibility of subterfuge). The scope of the search must also be strictly circumscribed by the emergency which justified its initiation. *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Laney*, 117 S.W.3d at 862.

 Consent to search is another of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Carmouche*, 10 S.W.3d at 331. In order to be valid, the consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.; see also Allridge v. State*, 850 S.W.2d 471, 493 (Tex.Crim.App. 1991). (stating that, "The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion."). By the same token, consent is not established by "showing no more than acquiescence to a claim of lawful authority." *Carmouche*, 10 S.W.3d at 331 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)).

### 3. Evidence Presented

There is no dispute that the initial search in this case was conducted without a warrant. Officer Harmuth was the only person to testify during the suppression hearing. The evidence presented at the suppression hearing shows that Officer Harmuth responded to a 911 call where the caller hung up before giving any information to police. He arrived at the scene approximately ten to fifteen minutes following the 911 hang-up call and did not turn on his lights or siren when responding to the scene. When he arrived, he looked through the window and saw a light was on in the house, that the house was ransacked, and that two small dogs were standing by the door. Donna answered the door approximately a minute or two later, dressed only in her underwear. She cracked the door, and Officer Harmuth could not see what was behind the door. Officer Harmuth asked her if she was okay, and she said, "No." He asked her what was going on, and she stated that she was "scared." He testified that Donna appeared to be visibly shaken and that he saw a large welt above her left eye and some marks around her throat and neck. Officer Harmuth asked Donna whether anyone else was in the house, and she responded that her husband was there. He asked her where her husband was, and she told him that her husband was in the bedroom. He told her that he was going to come inside to make sure everything was fine.

Officer Harmuth stated in the suppression hearing that he did not obtain Donna's consent to enter the house; rather he told her that he was coming in. He stated that he "felt like there was an emergency going on inside" because Donna "was visibly shaken, and had injuries" and because the 911 hang-up call had come from that residence.

Officer Harmuth acknowledged on cross examination that he never attempted to determine why Donna told him that she was "scared." He further testified that his purpose in entering the house was "to investigate what was going on." He stated that he was acting under an exigency because of Donna's injuries and the 911 hang-up call. On cross examination, Officer Harmuth further explained that 911 hang-up calls are not unusual at all, and the source of this particular 911 hang-up could not be explained.

Following the suppression hearing, the trial court ruled that exigent circumstances existed to justify the search to render aid or assistance to the person who

the officer believed was in need of assistance. The trial court found that there was a 911 call hang-up, fifteen minutes later the officer arrived, and he found the room ransacked. The court found that the woman was trembling and scared, and she had a large welt over her eye and marks around her neck. Furthermore, the trial court found that when the officer asked if someone was inside, she said, "Yes, but I am scared," and the officer thought she may have been assaulted. The trial court also stated in the record that Donna impliedly consented to Officer Harmuth's entrance into the house by opening the door and stepping aside.

At trial, Officer Harmuth testified that he did not respond to the 911 hang-up call with his full lights and sirens on because the caller had hung up the phone, so the dispatcher did not have any additional information to give him. When he arrived at the house, a light was on inside, shredded papers were on the floor, and it was quiet. He knocked on the door, waited, rang the doorbell, and knocked again. Through the window, he saw a woman approach the door wearing only underwear. She partially opened the door and Officer Harmuth asked her if everything was okay. According to Officer Harmuth, she appeared visibly shaken, scared and terrified. Officer Harmuth asked her if everything was okay, and she informed him that she was "scared." He noticed that she had an injury to her eye. Officer Harmuth asked whether there was anyone in the house with her, and she responded that there was and that she was scared. He asked her who was in the house with her and she informed him that her husband was inside the house with her and he was in the bedroom.

At that point, Officer Harmuth requested that a backup unit respond to the location. Officer Harmuth told Donna that he needed to come inside, at which point she stepped aside and opened the door. At trial, he stated that, based on his observations of Donna at the door, he "believed there was something more than just a 911 hang-up going on. There was obviously a situation which needed to be investigated, and [he] went inside." Because he was unsure of whether Appellant was still in the bedroom, he scanned the rooms as he walked through the house and into the bedroom where he found Appellant lying in bed. At that point, Officer Harmuth began to ask Appellant what had happened, and Appellant informed him that he was trying to get some sleep, but his wife was making noise, and he got mad, but he did not physically hurt her. Donna entered the bedroom and yelled, "That's not true." Officer Harmuth noticed a cordless phone on the floor that appeared to be broken. Appellant told Officer Harmuth that the phone was broken because he thought Donna was going to call their pregnant daughter to discuss their fight, and he did not want Donna to upset her.

Once the back-up officer, Officer Wells, arrived, he and Officer Harmuth questioned Appellant and Donna separately. Officer Harmuth testified that as he questioned Donna, she appeared to be visibly shaken, scared, and terrified. She told Officer Harmuth that Appellant had assaulted her because he was trying to sleep and she was making noise. She informed Officer Harmuth that Appellant had hit her with a closed fist above her left eye, grabbed her by the throat, and threw her to the floor. She then attempted to dial 911 on the phone, but Appellant grabbed the phone and threw it. Officer Harmuth and Officer Wells determined that an assault—family violence had occurred and there was still a threat of family violence, and they placed Appellant under arrest.

We need not address whether Donna consented to Officer Harmuth's entry into the house because the entry was justified under the emergency doctrine. At the time of the search, Officer Harmuth was aware that he was responding to a 911 hang-up call, the house was ransacked, a visibly shaken and scared woman answered the door clad only in her underwear and stated that she was "scared," her husband was inside the house with her, and she had an injury above her left eye. Thus, according to the facts and circumstances known to Officer Harmuth at the time of the entrance into the house, we hold that he had an objectively reasonable cause to believe that, absent an immediate search, serious bodily harm or death may result. *See Laney,* 117 S.W.3d at 863; *Brimage,* 918 S.W.2d at 500–01; *see also Randolph,* 126 S.Ct. at 1525 (stating that police may be justified in entering a dwelling to protect the resident from domestic violence, so long as they have good reason to believe that such a threat exists or to determine whether violence has just occurred). Additionally, Officer Harmuth's search was totally divorced from the investigation relating to a violation of a criminal statute because his purpose for entering the house was to determine whether Donna was in danger. *See Laney,* 117 S.W.3d at 862. Finally, the scope of the search was strictly circumscribed by the emergency which justified its initiation because Officer Harmuth's entrance into the house was limited to the determination of whether Donna was in danger of serious bodily harm or death. *See id.*

The dissent in the instant case opines that a recent United States Supreme Court case requires the conclusion that the emergency doctrine is not applicable to the facts of this case because Officer Harmuth's warrantless entry into the house was to investigate a possible completed criminal offense. Dissent at 251. *See*

*Hammon v. Indiana,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In that case, and its companion case, *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court dealt with the issue of whether statements were testimonial when they were procured by law enforcement personnel during a 911 call or at a crime scene, and thus, subject to the requirements of the Sixth Amendment's Confrontation Clause. *Id.* at 2270, 126 S.Ct. 2266. That is not the issue before us. Therefore, we disagree with the dissent in the case at bar that our holding violates the holding of *Hammon* or *Davis.* We overrule Appellant's first point.

## COMMENT ON THE FAILURE TO TESTIFY

In his second point, Appellant contends that the trial court erred by allowing the State to comment on his failure to testify. During the State's closing argument, the following exchange occurred:

[STATE]: You look at self-defense. His defense is—self-defense is you have to find, and they have to admit, that they did have a contact. Okay. He's got to say he hit her.

[DEFENSE COUNSEL]: That's a direct—that—Your Honor, I'm sorry. I object. That is a misstatement of the law. I object to that. That's a comment on failure to testify. That's a—

[STATE]: Your Honor, would you rule on the objection?

THE COURT: Make your objection, please. Don't testify.

[DEFENSE COUNSEL]: I object that it's Fifth Amendment grounds; Article I, Section 10. He's made a direct comment on failure to testify, and I object.

THE COURT: Okay. I believe what he said was, she's got to say he hit him

[sic]. That's what the record states in front of me that I've got.

[DEFENSE COUNSEL]: I heard—

THE COURT: And I'll overrule the objection.

[DEFENSE COUNSEL]:—that he's got to admit it. That's what I heard. THE COURT: That's what the court reporter has written right here, she's got to.

■■■■■ Under code of criminal procedure article 38.08, a defendant's choice to not testify on his own behalf shall not be taken as circumstance against him, and his failure to so testify shall not be alluded to or commented on by counsel. TEX.CODE CRIM. PROC. ANN. art. 38.08 (Vernon 2005). To determine if a prosecutor's comment violated article 38.08 and constituted an impermissible reference to an accused's failure to testify, we must consider whether the language used was manifestly intended or was of such a character that the jury would have naturally and necessarily considered it to be a comment on the defendant's failure to testify. TEX.CODE CRIM. PROC. ANN. art. 38.08; *see Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim.App.2001); *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex.Crim.App.), *cert. denied*, 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999). The offending language must be viewed from the jury's standpoint, and the implication that the comment referred to the accused's failure to testify must be clear. *Bustamante*, 48 S.W.3d at 765; *Swallow v. State*, 829 S.W.2d 223, 225 (Tex.Crim.App.1992). A mere indirect or implied allusion to the defendant's failure to testify does not violate the accused's right to remain silent. *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim.App.2004); *Patrick v. State*, 906 S.W.2d 481, 490–91 (Tex.Crim.App.1995), *cert. denied*, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996).

Prior to the statement to which Appellant objected, the prosecutor discussed Donna's testimony and the affidavit that Donna wrote, saying "Nowhere in there does she ever say that [Appellant] didn't hit her, not one time." The prosecutor then began discussing self-defense. The record reflects that the prosecutor said, "He's got to say he hit her." However, following Appellant's objection, the trial court said, in front of the jury, that he heard the prosecutor say, "She's got to say...." Then, the trial court stated that the record in front of him said, "She's got to say." Appellant contends that the prosecutor's comment undoubtedly pointed to a lack of evidence that could only have come from Appellant, and therefore, it was improper. However, the evidence regarding whether Appellant struck Donna could also have been presented by Donna, as well as Appellant. Additionally, it is not precisely clear that the prosecutor was in fact alluding to Appellant when he made the statement; the above-quoted discussion likely caused confusion or doubt in the mind of the jury as to whether the prosecutor had said "he" or "she." Viewing the statement that Appellant contests from the jury's standpoint, we hold that there is no clear implication that the comment referred to Appellant's failure to testify. *See Bustamante*, 48 S.W.3d at 765. The language the prosecutor used was not of such a character that the jury would have naturally and necessarily have considered it to be a comment on the Appellant's failure to testify. *See id.* Accordingly, we overrule Appellant's second point.

## "STRAW MAN" THEORY

In his third point, Appellant alleges that the State engaged in improper "gamemanship" by first calling Officer Harmuth to testify as to hearsay statements from the complainant, Donna, and by calling Donna

for the sole purpose of impeaching her with prior statements that would otherwise be inadmissible. He asserts that the State knew that Donna was going to testify adversely to the State's case, and to counter the adverse testimony, the State called Officer Harmuth to get prior statements made by Donna presented to the jury before she testified, knowing that her statements would be inconsistent with Officer Harmuth's testimony regarding her prior statements.

We review a trial court's ruling to admit or exclude evidence under an abuse of discretion standard. *Green v. State,* 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g). If the court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Montgomery,* 810 S.W.2d at 391. As long as the trial court's ruling falls within the zone of reasonable disagreement, we will affirm its decision. *Moses v. State,* 105 S.W.3d 622, 627 (Tex.Crim.App.2003). The trial court's decision must be reasonable in view of all the relevant facts. *Santellan v. State,* 939 S.W.2d 155, 169 (Tex.Crim.App.1997).

■ Texas Rule of Evidence 607 provides that the credibility of any witness may be attacked by any party, including the party that called the witness. Tex.R. Evid. 607. The right to impeach one's own witness does not, however, permit a party to call a witness primarily for the purpose of impeaching the witness with otherwise inadmissible hearsay testimony. *Zule v. State,* 802 S.W.2d 28, 34 (Tex.App.-Corpus Christi 1990, pet. ref'd); *Pruitt v. State,* 770 S.W.2d 909, 909 (Tex.App.-Fort Worth 1989, pet. ref'd).

■ The State argues that the hearsay testimony of which Appellant complains was admissible because the statements fall within the excited utterance ex-

ception to the prohibition against hearsay. *See* Tex.R. Evid. 803(2). Rule 803(2) provides that a statement is not excluded by the hearsay rule if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex.R. Evid. 803(2). To determine whether a statement qualifies as an excited utterance, (1) the statement must be the product of a startling occurrence, (2) the declarant must have been dominated by the emotion, excitement, fear, or pain of the occurrence, and (3) the statement must be related to the circumstances of the startling occurrence. *Couchman v. State,* 3 S.W.3d 155, 159 (Tex.App.-Fort Worth 1999, pet. ref'd). Other factors to consider are whether the statements are spontaneous or responses to questions and how much time has elapsed between the startling event and the statement. *See Wood v. State,* 18 S.W.3d 642, 652 (Tex.Crim.App.2000) (evaluating whether statement was excited utterance after fourteen-month delay); *Bondurant v. State,* 956 S.W.2d 762, 766 (Tex.App.-Fort Worth 1997, pet. ref'd) (determining that statement was excited utterance even though made in response to questions). It is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *Salazar v. State,* 38 S.W.3d 141, 154 (Tex.Crim. App.), *cert. denied,* 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001). "The critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *Id.* (quoting *McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App.1992), *cert.*

*denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993)).

Appellant concedes that the excited utterance exception may apply to the statements that Donna made upon first encountering Officer Harmuth on the porch. However, he relies upon *Moon v. State* for the assertion that the statements that Donna made to Officer Harmuth when he interviewed her for a second time do not constitute excited utterances. *See* 44 S.W.3d 589 (Tex.App.-Fort Worth 2001, pet. ref'd). These statements were made after Appellant had been interviewed by police, Donna had put on more clothing, and a back-up officer had arrived. In *Moon,* the trial court did not abuse its discretion in admitting the statements that the complainant made to police that her husband had "beat her" approximately thirty minutes earlier under the excited utterance exception, because the complainant's statements were dominated by her emotions, fear, and excitement. *Id.* at 594. However, the court determined that the trial court did abuse its discretion in admitting the written statements that the complainant gave a police officer within forty-five minutes of his arrival because she was not excited or upset at the point when she gave the written statements. *Id.*

*Moon* is distinguishable from the case at bar because Donna's statements were made when she was still dominated by her emotions, fear, and excitement. According to Officer Harmuth's testimony, after Officer Harmuth separated Appellant and Donna, he began to question Donna separately, and "she was still visibly shaken, scared, soft/monotone when she answered my questions. You know, terrified." He later testified that she was "still very scared, trembling, afraid" when she gave

him those statements. The statements that Donna then gave Officer Harmuth were the product of a startling occurrence, the alleged assault—family violence that occurred, and the statements she gave were related to the circumstances of the startling occurrence. Officer Harmuth testified that he was in the house for approximately ten minutes when Donna made these statements to him and it was the first opportunity that he had to speak with her about what had happened. He explained that he asked Donna what happened, and she told him in narrative form. Thus, the trial court's ruling falls within the zone of reasonable disagreement because the statements that Donna gave to Officer Harmuth fall within the excited utterance exception to the general prohibition against hearsay. Here, Donna was still dominated by the emotions, excitement, fear, or pain of the event. *See Salazar,* 38 S.W.3d at 154.

The trial court did not abuse its discretion in determining that the statements were excited utterances; thus, the State's purpose in calling Donna was not solely to introduce into evidence otherwise inadmissible hearsay because the statements were not otherwise inadmissible. Furthermore, the statements had been previously admitted through Officer Harmuth's testimony. Additionally, one of the State's purposes in calling Donna was to corroborate portions of Officer Harmuth's testimony and to confirm that she had made the 911 call. Therefore, we hold that the State did not call Donna for the sole purpose of impeaching her with prior statements that would otherwise be inadmissible.[1] Accordingly, we overrule Appellant's third point.

---

1. Appellant does not contend that the use of Donna's prior statements at trial was a violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Accordingly, that issue is not before us.

## REQUESTED JURY INSTRUCTIONS

In his fourth point, Appellant contends that the trial court erred by failing to include a charge to the jury regarding defense of third persons and regarding the officer's warrantless entry and ensuing warrantless search of his home.

### 1. Standard of Review

 Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State,* 871 S.W.2d 726, 731 (Tex. Crim.App.1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981); *see also Abdnor,* 871 S.W.2d at 731–32; *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1985) (op. on reh'g). In other words, a properly preserved error will call for reversal as long as the error is not harmless. *Almanza,* 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.; see also Ovalle v. State,* 13 S.W.3d 774, 786 (Tex.Crim.App. 2000).

### 2. Requested Charge on Defense of a Third Person

 Defense of a third person is a justification for the use of force against another if the circumstances are such that the person would be justified in using the force to protect himself and "the actor reasonably believes that his intervention is immediately necessary to protect the *third person.*" TEX. PENAL CODE ANN. § 9.33 (Vernon 2002) (emphasis added). Appellant requested a jury instruction on defense of a third person. Appellant argues that the instruction should have been given because, according to Donna's testimony, she became angry with Appellant and began to beat on his arm as Appellant drove down the interstate highway. She testified that, in order to avoid having an accident, Appellant reacted by striking her temple. Appellant elicited testimony from Donna that he hit her in order to prevent an accident from occurring to protect the vehicle, Donna, and himself.

The application paragraph of Appellant's requested jury instruction stated the following:

> Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question [Appellant] did strike or grab or throw Donna White with his hand, but you further find from the evidence, or you have a reasonable doubt thereof, that viewed from the standpoint of [Appellant] at the time, it reasonably appeared to [Appellant] that *Donna White was in danger of bodily injury* and there was created in his mind a reasonable expectation or fear of bodily injury, and that acting under such apprehension and reasonably believing that the use of force on his part was immediately necessary *to protect Donna White,* [Appellant] struck, grabbed, or threw Donna White with his hand, then you will acquit [Appellant], or, if you have a reasonable doubt as to whether or not [Appellant] was acting in defense of a third person on said occasion and under said circumstances, then you should give [Appellant] the benefit of

that doubt and say by your verdict not guilty. [Emphasis added.]

In essence, Appellant was requesting a jury charge on defense of a third person for defending Donna from herself. When interpreting a statute, we look to the literal text for its meaning, and we ordinarily give effect to that plain meaning. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim. App.1991). The only exceptions to this rule are where application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended, or if the plain language is ambiguous. *Id.* The plain language of penal code section 9.33 provides a defense when a person uses force against another in order to protect a *third person.* *See* TEX. PENAL CODE ANN. § 9.33. Here, the evidence shows only that Appellant used force against Donna to protect himself from Donna. Appellant's requested charge reflects his assertion that he was, in essence, acting to protect Donna from herself; however, protecting Donna from herself is not protecting her from a *third person.* Accordingly, the trial court did not err in determining that Appellant was not entitled to a jury instruction on defense of a third person.

### 3. Requested Charge Concerning the Warrantless Entry and Search

■■■ Article 38.23(a) provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2005). The court of criminal appeals has ex-

plained that the admissibility of evidence is a matter for the court. *Pierce v. State,* 32 S.W.3d 247, 251 (Tex.Crim.App.2000).

■■■ The second sentence of article 38.23(a) provides that, "[i]n any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." TEX.CODE CRIM. PROC. ANN. art. 38.23(a). This sentence can operate only if the trial court has admitted evidence, and only if there is a contested issue of fact about the obtaining of the evidence. *Pierce,* 32 S.W.3d at 251. Thus, there is no issue for the jury when the question is one of law only. *Id.* Accordingly, although a fact issue on a defensive theory may be raised "from any source, and the evidence may be strong, weak, contradicted, unimpeached, or unbelieveable," an article 38.23 jury instruction must be included in the jury charge only if there is a factual dispute about how the evidence was obtained. *Garza v. State,* 126 S.W.3d 79, 85 (Tex.Crim.App.2004).

In the present case, Appellant requested a jury instruction under article 38.23,[2] but the trial court denied his request. Here, there was no dispute that Donna called 911 and hung up, that injuries to Donna's face and neck were visible to Officer Harmuth when he initially spoke with her, that torn up paper was scattered on the floor of her house, or that she told Officer Harmuth that she was scared. Donna did refute Officer Harmuth's testimony that she came to the door dressed only in her underwear, explaining that she also had on a sweatshirt. She also testified that she told Officer Harmuth that he could not come

---

2. We note that the application paragraph of Appellant's requested instruction is incorrect in that it fails to instruct the jury that a

warrantless search could be justified under either the emergency doctrine or under exigent circumstances.

into the house. There was no dispute, however, as to the facts upon which the exigent circumstances were determined. Because a jury charge must be submitted only if a factual dispute exists as to how the evidence was obtained, we hold that the trial court did not err in refusing to include the requested instruction. *See id.* Accordingly, we overrule Appellant's fourth point.

## CONCLUSION

Having overruled Appellant's four points, we affirm the judgment of the trial court.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice, dissenting.

Because I disagree with the majority's conclusions that the warrantless entry into the house was lawful, that the prosecutor did not comment on Appellant's failure to testify, and that the complainant's response to the investigating police officer's directive to explain what had happened was a series of excited utterances, I respectfully dissent.

The majority holds that Officer Harmuth and the back-up officer were justified in entering the house without a warrant "under the emergency doctrine" in that, at the time Officer Harmuth entered the house, "he had an objectively reasonable cause to believe that, absent an immediate search, serious bodily harm or death [could] result."[1] Serious bodily harm or death to whom? The complainant was at the front door within the protection of the police, freely able to leave at any time.

Appellant was in another room and not visible. Neither the State, the majority, the police officers, nor the complainant has suggested at any time that any other person was present inside the house. Who was in danger?

Indeed, the record does not support the majority's conclusions. Officer Harmuth testified that he never attempted to learn why the complainant told him that she was scared. He testified only that his purpose in entering the house was "to investigate what was going on." He also testified, "There was obviously a situation which needed to be investigated, and I went inside." As the majority correctly states, "[a] search conducted without a warrant is per se unreasonable unless it falls within one of the 'specifically defined and well-established' exceptions to the warrant requirement."[2] Additionally, the majority correctly states that "[t]he motivation for entry pursuant to the emergency doctrine must be 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"[3]

Yet Officer Harmuth testified that his only purpose in entering the house was to conduct an investigation. The majority's conclusion that Officer Harmuth "had an objectively reasonable cause to believe that, absent an immediate search, serious bodily harm or death [could] result" can in no way be derived from the officer's testimony.[4]

Similarly, although the majority concludes that Officer Harmuth's entry into the house was justified by and "limited to the determination of whether [the complainant] was in danger of serious bodily

---

1. Majority op. at 243.

2. *Id.* at 240 (citations omitted).

3. *Id.* at 240 (citations omitted).

4. *Id.* at 243.

harm or death,"[5] the complainant was in none of the rooms that the police searched. She was at the front door and merely followed the officer back to the bedroom. If there was a threat to the complainant's safety, it lay in the room she followed the officer to. Officer Harmuth had only to ask the complainant, while they were at the front door, to step outside and tell him what was going on. There was no emergency.

*Hammon v. Indiana*, a recent United States Supreme Court case addressing the issue of whether a complainant's statement made to law enforcement personnel at a crime scene was testimonial and thus subject to the requirements of the Sixth Amendment's confrontation clause,[6] concerned similar facts. As in the case now before this court, the complainant, Amy Hammon, was on the front porch and her husband, Hershel, was inside the house. When the police arrived in response to a domestic disturbance call, Amy Hammon told the police that nothing was the matter, but she appeared frightened. Hershel Hammon was in the kitchen. Officers saw broken glass on the floor. The officers separated Amy and Hershel and asked each of them to explain what had happened.

In distinguishing between testimonial and nontestimonial statements to reach its ultimate holding that Amy's statements were testimonial, the United States Supreme Court also distinguished between emergency situations and non-emergency investigations:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[7]

In *Hammon*, the court explained why there was no emergency and why the response to the police interrogation was therefore testimonial:

> It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything. When the officers first arrived, Amy told them that things were fine, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.[8]

In *Davis v. Washington*, Hammon's companion case, the court determined when statements made to law enforcement during a 911 call are testimonial and thus subject to the strictures of the Sixth

---

**5.** *Id.* at 243.

**6.** *Hammon v. Indiana,* —— U.S. ——, ——, 126 S.Ct. 2266, 2270, 165 L.Ed.2d 224 (2006).

**7.** *Id.* at 2273–74 (footnote omitted).

**8.** *Id.* at 2278.

Amendment's Confrontation Clause.[9] The complainant in that case, Michelle McCottry, spoke with a 911 operator during an ongoing domestic violence assault. After the 911 operator learned the identity of the assailant, Adrian Davis, and that he had run off during the 911 conversation, she interrogated McCottry, discovering Davis's personal information and why he had been at McCottry's house and getting McCottry's description of the "context of the assault."[10] As the United States Supreme Court points out, the 911 call was initially "plainly a call for help against [a] bona fide physical threat," and the statement providing the assailant's identity was not testimonial.[11] But, even in that case, the United States Supreme Court emphasized that

> after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial

because they provided an account of past events after the emergency had passed.[12]

It is clear from a thorough review of the record in the case now before this court that Officer Harmuth's only purpose in entering the house, according to his own testimony, was to investigate a possible completed criminal offense. Relying on the test established by *Davis* and *Hammon*, there was no ongoing emergency when Officer Harmuth arrived on the scene. Just as Amy Hammon was under

the protection of the police when she gave her statements, so was the complainant in the case now before this court when she told her story. Officer Harmuth responded to a 911 call, but from the time that he met the complainant at the front door, he sought to investigate what had happened, not what was happening. This investigatory purpose does not transform the illegal, warrantless entry into a legal one. Because the majority opinion is in direct conflict with the clear test established by the Supreme Court of the United States, I dissent from the majority's upholding the search as an emergency when no emergency existed.

The majority also holds that the State's closing argument, "His defense is—self-defense.... [T]hey have to admit.... *He's got to say he hit her,*" "was not of such a character that the jury would have naturally and necessarily ... considered it to be a comment on the defendant's failure to testify."[13]

The majority relies on the trial judge's comment regarding the complained-of argument to hold the prosecutor's statement ambiguous. The trial judge responded to Appellant's objection to the prosecutor's argument that Appellant would have to admit that he had hit the complainant, saying, "I believe what he said was, she's got to say he hit him [sic]. That's what the record states in front of me that I've got," and "That's what the court reporter has written right here, she's got to."

It has long been established that a trial judge shall not "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to con-

9. —— U.S. ——, ——, 126 S.Ct. 2266, 2270, 165 L.Ed.2d 224 (2006).

10. *Id.* at 2271.

11. *Id.* at 2276–77.

12. *Id.* at 2277.

13. *Id.* at 244 (emphasis added).

vey to the jury his opinion of the case." [14] In the case now before this court, the record clearly reflects that the prosecutor said, "He's got to say he hit her." Only the trial court's statement to the contrary suggests that the prosecutor said anything else.

"The court, instead of merely ruling upon the objection as he should have done, made a comment upon the complained of argument. . . ." [15] Because the prosecutor's argument in the case now before this court was clearly a comment on Appellant's failure to testify, the trial judge could not create any ambiguity by expressing a personal opinion. I therefore respectfully dissent from the majority's holding otherwise.

Finally, the majority mischaracterizes the complainant's narrative statement to Officer Harmuth in response to his directive that she explain what had happened as a series of excited utterances because "the complainant's statements were dominated by her emotions, fear and excitement." [16]

It is well established that

An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The basis for the excited utterance exception is "a psychological one, namely, the fact that *when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'*" In other words, *the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event.*

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question. [17]

In *Hughes v. State,* [18] our sister court in Tyler rejected the State's contentions that a complainant's statements produced as a result of an interview were excited utterances:

. . . . That some of a declarant's statements were in response to questions does not necessarily make them inadmissible under this exception to the hearsay rule. But it is an important factor in determining the spontaneity of the statement. Both Deputy Wellborn and Ms. Baggerly asked C.D.H. questions calculated to elicit information about past events and activities. "Responses to this type of questioning are normally considered reflective narratives of past events" and hence lacking the spontaneity required to be admissible under this exception. . . . [T]he rule requires a determination (1) whether C.D.H.'s presence with Opal and Deputy Wellborn at Opal's interview was an occurrence startling enough to produce a state of nervous excitement which would render her statements made during two lengthy interrogations "spontaneous and unreflecting" and, if so, (2) whether the startling event continued to dominate the reflective powers of her mind during

---

**14.** Tex.Code Crim. Proc. Ann. art. 38.05 (Vernon 1979).

**15.** *McClory v. State,* 510 S.W.2d 932, 934 (Tex.Crim.App.1974).

**16.** Majority op. at 246.

**17.** *Zuliani v. State,* 97 S.W.3d 589, 595–96 (Tex.Crim.App.2003) (emphasis added) (citations omitted).

**18.** 128 S.W.3d 247 (Tex.App.-Tyler 2003, pet. ref'd).

that period. Several circumstances argue against it here.

C.D.H. was brought to the Grapeland Police Department to lend moral support for her younger cousin Opal while she talked to the investigators. Opal and C.D.H. had recently discussed their shared history as victims of sexual abuse. C.D.H. had assured Opal that if she had to turn her father in, she would not be left to suffer alone. She knew why she was going to be with Opal, and she knew what she was going to hear. It was undoubtedly stressful but should not have been startling or surprising. The two interviews were conducted in tandem. The length of the interviews is itself a circumstance arguing against unreflecting spontaneity. The record indicates that both girls remained in the room throughout the interviews by both Deputy Wellborn and Ms. Baggerly. The investigators, in their testimony, did not recount unreflecting statements made by the complainant. Instead, they summarized what they described as a very detailed narrative that emerged over a protracted interrogation.

. . . .

Responding to the investigator's questions, C.D.H. narrated a painful personal history. But narrations, especially of this length, are inherently reflective, not spontaneous. As its name strongly suggests, the exception for excited utterances or spontaneous declarations was not developed to allow the introduction into evidence of extended narratives by crime victims, and certainly not summaries of those narratives as in the instant case.

. . . .

In this case, it is impossible to conclude that C.D.H.'s statements were made without opportunity for reflection or deliberation. We decline to further expand the excited utterance exception to include a summary distilled from a protracted interrogation.[19]

In the case before us, the majority's conclusion that "the statements that [the complainant] gave to Officer Harmuth fall within the excited utterance exception to the general prohibition against hearsay because [the complainant] was still dominated by the emotions, excitement, fear, or pain of the event"[20] is not supported by the record. After Officer Harmuth entered the house, and after he spoke with Appellant, the complainant told her story to Officer Harmuth in response to his directive that she explain what had happened. The circumstances in which she told her story, as provided in the record, in no way indicate that she had lost the capacity for reflection necessary to the fabrication of a falsehood. Indeed, the officer's asking her to explain what had occurred that evening presupposes that she would reflect on her answer before speaking.

Additionally, the record shows that Officer Harmuth arrived at the house about fifteen minutes after the 911 hang-up call and that he did not begin his separate interview with the complainant until about ten minutes after he arrived. Before Officer Harmuth began his interview with the complainant, she apparently heard her husband give his version of the events that had taken place to the officer, and she angrily interrupted the interview to correct her husband. Even though the complainant stated that she was afraid when she spoke to the officer at the front door, about ten minutes later, she was not too afraid to return to the bedroom and argue with her husband about his version of the

---

**19.** *Id.* at 253–54.

**20.** Majority op. at 246.

events that had transpired before giving the officer her own story. Because the majority incorrectly characterizes the complainant's story as a series of excited utterances, I must respectfully dissent from this portion of the majority opinion.

For all the reasons stated above, I respectfully dissent from the majority opinion.